### J. DAY FLACK v. NATHAN W. CONDICT.

Submitted March 25, 1901—Decided June 10, 1901.

1. Defendant was a manufacturer of refrigerating machines. Plaintiff was employed by him at a salary of $100 a month, and in addition to that he was to be paid commissions at the rate of three per cent. on the amount of certain sales. This suit was brought to recover commissions on three contracts—*first,* a contract called the Parker House contract; *second,* a contract called the Butler contract, and *third,* a contract with the United States government for putting in an ice-making apparatus at West Point. The contract between the parties with respect to the payment of commissions, after providing for the payment of a salary at the rate

of $100 a month, stipulated for a commission of three per cent. on the gross amount of sales directly secured by the plaintiff. It is admitted that the first two contracts were negotiated by the plaintiff within the terms of the agreement. The defence was that the plaintiff had waived his commissions. Plaintiff had disobeyed instructions in taking the contract for less than the price fixed, and the contract was accepted by the defendant on the condition that plaintiff would waive his commission. *Held*—

1. That the evidence was sufficient to show an unconditional waiver.

That such waiver was not void for want of consideration.

2. The dispute over the West Point contract related to the question whether the negotiation of that contract was within the terms of the agreement for the payment of commissions. The contract was negotiated by the defendant's son directly with the officers at West Point having charge of the work. The defendant testified that the plaintiff had no connection with the West Point matter, except after the first bids were thrown out, in going to West Point to get information. The plaintiff makes no claim that he negotiated or procured this contract in the sense of contracts such as are usual upon the employment of an agent to secure contracts or make sales, to be compensated for by a commission. *Held*, that the plaintiff was entitled to commissions only on sales directly made by him, and that he could not recover a commission for the sale in question, it not being of that character.

On contract. On rule to show cause.

Before DEPUE, CHIEF JUSTICE, and Justices DIXON, COLLINS and HENDRICKSON.

For the plaintiff, *Frank E. Bradner*.

For the defendant, *McGee & Bedle*.

The opinion of the court was delivered by

DEPUE, CHIEF JUSTICE. The defendant was a manufacturer of machinery, and especially of a refrigerating machine, carrying on business at Jersey City. The plaintiff entered the defendant's employ September 1st, 1898, on terms that he was to receive a stated salary of $100 a month, and he be paid commissions at the rate of three per cent. on the amount of certain sales. The monthly salary has been paid. The litigation is over the plaintiff's claim for commissions. The

suit relates to the claim for commissions on three contracts, referred to in the case as follows: *First,* contract with the Pabst Brewing Company, called the "Parker House Contract," to put an ice machine in the Parker House in New York for the sum of $2,000; *second,* contract with Thomas J. Butler for installing a refrigerating plant in the buildings at Sixty-ninth and Seventieth streets and the Boulevard, New York City, called "The Butler Contract," for $13,561.50; *third,* contract with the United States Government for putting in an ice-making apparatus at West Point, for the sum of $7,336.

The jury found that the plaintiff was entitled to commissions on all three of these contracts, and the verdict was for $731.63, being the amount of such commissions, with interest.

The controversy in this case relates to the terms and conditions under which these commissions were by the contract to be paid. With respect to the Parker House contract and the Butler contract, no question was made that they came under the agreement of the parties as to commissions. With regard to these claims for commissions, the contention of the defendant was that the plaintiff had waived his commissions.

With respect to the Parker House contract, the defendant testified: "The plaintiff called me up on the telephone and stated that the Pabst people had offered $1,800. I said, 'Day' (that is Flack's name) 'there is no use.' 'Well,' he says, 'I may be able to get $2,000.' 'Well,' I says, 'If you can get $2,000 and waive your commission we will attempt it, but I don't think we can get out whole.'"

Mr. Lee Condict, the defendant's manager, testified that the price the defendant asked for the work was between $2,900 and $3,000. "Mr. Slipe, the agent of the Pabst Brewing Company, said he wouldn't pay that amount, and I said, 'All right; we won't take it for any less.'" He also testified that "Mr. Flack was present at that interview, and when we got outside I told him that we might make a slight concession on that job if we could get it; if we could get it for $100 or $200 less we would rather have it than lose it. The plaintiff was to see these parties later in the day, and I told

him under no circumstances to take a contract for less than $2,600; that was the limit, and he understood it; he said it was all right. The next morning my father told me they had taken the job for $2,000; that we would lose money on it, and that he (Flack) had disobeyed my instructions. The plaintiff was present at this interview, and I said to him, 'We will lose money on the job; it has been accepted, and as honorable business men we will have to stand by our acceptance of the contract for $2,000, but I want you to understand now and here that you will have to waive your commission,' and he said he would." The plaintiff does not contradict the testimony of the defendant on this subject. When asked about the Parker House contract, the plaintiff testified that he had never disputed that, because Mr. Condict had said that they hadn't made any money on that. As I understand his admission, his claim on that subject was out of this suit. In the brief of plaintiff's counsel it is admitted that the plaintiff agreed to waive the commission if the defendant lost money on that particular job. He admits that the claim on the part of the defendant was that he did not make any money and that he lost some. On the cross-examination of Lee Condict he is asked by counsel for plaintiff the question whether the defendant kept books, and whether the books showed what the defendant lost on that job, and his answer was, "Yes, sir." Then the question was asked of him, "What did you lose on it?" That was objected to and excluded by the court on the ground that it was not material. It is insisted on the part of plaintiff's counsel that the jury inferred from the non-production of the books that they would not show any loss on that job, and concluded that a loss had not been proved. The court having considered the amount of loss unimportant, the non-production of the defendant's books was comparatively not of much importance in the case. It will also be observed that the testimony is that the agreement of the plaintiff to waive his commission was made on the condition that the price of $2,000 would be accepted. I think that is the clear weight of the testimony on that subject. The plaintiff testified that the next morning after the

price of $2,000 was accepted, "Mr. Lee Condict was rather angry that his father had accepted $2,000, and then he said I would have to waive my commission if they lost money on that job, rather forcing me to accept the waiver."

"*Q.* He forced you to accept the waiver?

"*A.* He said I would have to do it. I assented. What else could I do?"

The proof of waiver is decisive, and the clear weight of the evidence is that it was unqualified and without condition. In that view of the case the production of the books to show the amount of loss was wholly unnecessary.

The next consideration is the Butler contract. The price asked by the defendant for that machine was $13,000. Lee Condict testified that an offer was made by Butler "that if we would take that for $12,008 we could go on with the work." He testified that the negotiation with Butler was by telephone, and that the plaintiff was present. The witness testified that he said to the plaintiff, "If we accept that price, your commission must be waived," and that the plaintiff agreed to it. The plaintiff admits that he was present at that negotiation, and that he was asked by the defendant to waive his commission.

"*Q.* For what reason?

"*A.* That I had better leave it to him to take care of me. I stated that was the second time that that thing had been done, and the only condition I would agree to was that in case they lost any money on the job I would waive my commission."

With regard to this contract, there was admittedly a waiver. The only question is whether that waiver depended upon the condition that the defendant lost on the contract. There was no proof of a loss on this contract; but, as has already been said, the clear weight of the evidence is that the waiver was unconditional in both instances.

In addition to the other evidence on this subject, the letters written by the plaintiff are of considerable importance. He left the employment of the defendant on the 1st of November, 1899. December 27th, 1899, he wrote a letter to the defend-

ant in which he demanded commissions upon the West Point contract. This letter was sent, but is unsigned. It was followed by another letter, dated January 9th, 1900, demanding commissions on the West Point transaction. That letter is signed by the plaintiff. The last letter was sent two months after he had left the employment of the defendant, and contained no claim for commissions on the Parker House contract or on the Butler contract, and no claim whatever for commissions on these contracts was made by the plaintiff until this suit was commenced.

Nor was there in either of these cases any want of consideration to support the waiver. The evidence is that in the negotiation for the Parker House contract the plaintiff disobeyed instructions not to accept a contract for less than $2,600. The evidence with regard to the Butler contract is that the waiver of commissions by the plaintiff was part of the agreement by which the contract should be accepted at that price.

The verdict of the jury awarding commissions on these two contracts, we think, is against the weight of the evidence, and a new trial should be granted.

The remaining claim on the part of the plaintiff relates to the West Point contract. Mr. Lee Condict testified that the first news they had that such an apparatus was wanted by the government at West Point was given to him by a man by the name of Theberath. "He asked me if I knew that the government was advertising for an ice refrigerating plant; I told him no; I says to him, 'Can you get me a copy of the advertisement?'" He testifies that he got a copy of the advertisement and set to work at once to put in a bid; that his father went to West Point to get the original information for their first bid, and after that they made a bid. "The bids were opened on the 11th of May; I took up that bid myself; the bids were publicly opened at noon. They were all thrown out, and there was a re-advertisement, whereupon it became necessary to get further data." Major Hall, the treasurer of the United States Military Academy, visited the defendant's plant in New York City. "Major Hall said that he was sur-

prised at the exhibition we had made; it impressed him very much; in his mind it was a machine they wanted, and he said that he'd do all he could to have the thing re-advertised and see if he couldn't get the machine specified." Mr. Condict then testified that the plaintiff was sent up to West Point to take measurements and get details and make up specifications and drawings that were necessary to go in with the bid. The bid was subsequently put in and was accepted. He further testified that Mr. Flack had no connection with the West Point matter except, after the first bids were thrown out, in going up to West Point to get information.

In answer to the plaintiff's letter of January 9th, asking commissions on the West Point contract, the defendant, under date of January 11th, 1900, wrote: "As to the matter of commission asked for on the West Point plant, we fail to understand on what ground you make such claim, unless you have forgotten the facts in the case. We see no reason why such a claim is made at this late date."

The plaintiff in his testimony admits that Mr. Lee Condict ascertained that the contract was to be let, and went to West Point and put in a bid, and that he had nothing to do with that; that he had nothing to do with the new bids that were invited when the subject was reduced within the limit of the appropriation. He admits the negotiation of Lee Condict with Major Hall. He says that Mr. Lee Condict went over to see Major Hall in New York, and took him (the plaintiff) with him, and that that was his first connection with this thing at all; that a meeting was then arranged in New York between Mr. Lee Condict and Major Hall, at which he (the plaintiff) was present, and that the result was that the new bids were offered in such a way that the refrigerating plant of Steele & Condict could receive favorable consideration. The plaintiff says that after that he was sent to West Point to talk up this matter of the refrigerator, and it was at his instance that a change of boiler was proposed through the installation of the refrigerating plant; that after he was sent to West Point by Mr. Lee Condict the matter was turned over to him with instructions to go to West Point to finish

the thing up, and that he was sent there to follow. up the matter.

The plaintiff's claim for commissions on this transaction is based upon the assumption that he was to have a commission on any job he might be at all instrumental in securing. He makes no claim that he negotiated or procured this contract, in the sense of contracts such as are usual upon the employment of an agent to procure contracts or make sales, to be compensated for by a commission. Inasmuch as the plaintiff was employed in the defendant's establishment at a salary of $100 a month, his employment which was compensated for by that salary necessarily brought him in connection with the business of the defendant. It is quite unreasonable that with such an employment he should also be entitled to his three per cent. commission on all jobs which he should be instrumental in securing in the sense of his connection with this West Point transaction.

Besides that, a contract in writing was prepared by Mr. Lee Condict, which was not signed, but nevertheless is entitled under the circumstances to a considerable weight in this case. That contract contains these provisions: "The said party of the second part agrees to devote his entire time and services to the best of his ability, for which he is to be paid by the party of the first part a salary at the rate of $100 per month. Payable monthly as may be convenient; and in addition a commission of three per centum on gross amount of sales actually made during the time of this contract. Sales to be directly secured by him. Commissions payable when payments are made on contract secured." The contract also contains this clause: "The party of the second part is to render * * * an itemized statement of his traveling expenses, which, if approved, is to be paid by the party of the first part." This contract was prepared by Mr. Condict and was given to the plaintiff.

The plaintiff testified that the agreement between him and the defendant was put in writing; that Mr. Lee Condict put down on paper the conditions on which he was employed, and he handed that paper to the plaintiff; that he (the plaint-

iff) took it away; that he did not sign it nor return it to Mr. Condict, and that he didn't say anything more to Mr. Condict about it.

"*Q.* Did that paper disclose the arrangement you have testified to between you and Mr. Condict?

"*A.* As I understand it, pretty closely."

The witness then produced the paper.

"*Q.* I want to know whether that paper represents what Mr. Condict told to you as the conditions of your employment?

"*A.* Yes, sir; that's about as I understand it.

"*Q.* What is it you object to in it?

"*A.* Well, for instance, there's one clause in that thing that states that payments shall be made at their convenience. That was one of the main reasons I did not sign it.

"*Q.* Aside from that, does that represent the agreement as you understand it?

"*A.* Yes, sir.

"Q. Then I understand you to say, Mr. Flack, that your construction of this part of the agreement, 'Sales to be directly secured by him on which commissions are to be paid,' meant any sale with which you had any connection as to bringing to a conclusion?

"*A.* Yes, sir.

"*Q.* That's your construction of the words, 'Sales directly secured by' you?

"*A.* Yes, sir."

The testimony of the plaintiff discloses the fact that this paper, though not signed, in fact, correctly expresses the agreement between him and the defendant. The agreement on its face is clear and distinct, and the plaintiff cannot, as a witness, construe those words to conserve his own ideas. Every agreement to be binding must be the result of the concurrence of the minds of both contracting parties. Under the plaintiff's testimony, with respect to this paper, the parties had agreed that commissions were to be paid, not on all contracts with which the plaintiff in the course of his employment had connection, but upon sales directly secured by the

plaintiff.   The West Point contract was not of such a character.

We think, on this part of the case, also, the verdict of the jury was contrary to the evidence.

The rule to show cause should be made absolute.